## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOANNE VICK,

        Plaintiff,

v.                                                          Case No. 03-CV-73124-DT

METROPOLITAN LIFE INSURANCE
COMPANY,

        Defendant.

_____/

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT; DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO AFFIRM; AND DENYING DEFENDANT'S MOTION TO STRIKE

      Pending before the court are cross-motions for judgment, filed by Plaintiff

Joanne Vick on July 20, 2005 and Defendant Metropolitan Life Insurance Company

("MetLife") on August 10, 2005.  Both motions seek final judgment on Plaintiff's claim for

long-term disability benefits under 29 U.S.C § 1132(a)(1)(B).  Having reviewed the

briefs, the court concludes a hearing is unnecessary.  *See* E.D. Mich. LR 7.1(e)(2).  For

the reasons stated below, the court will deny in part and grant in part Defendant's

motion and grant Plaintiff's motion.  Defendant has also brought a motion to strike

certain materials attached to Plaintiff's motion for judgment.  The court will deny

Defendant's motion.

### I.  BACKGROUND

### A.  Introduction

      Plaintiff initially filed her complaint in Oakland County Circuit Court on July 23,

2003.  Defendant removed the case to this court on August 14, 2003, asserting subject

matter jurisdiction under 28 U.S.C. § 1331.  Plaintiff's complaint seeks reinstatement

and recovery of long-term disability ("LTD") benefits under an employee welfare benefit plan maintained by her employer, Electronic Data Systems, Inc. ("EDS").  EDS's Supplemental LTD Plan (the "Plan") is governed by the Employee Retirement Income Security Act ("ERISA") and makes long-term disability benefits available to certain plan participants.  The long-term disability benefits are funded by an insurance policy issued by Defendant MetLife.  MetLife also serves as the claims fiduciary under the Plan and has authority to make final determinations on eligibility for benefits.  In essence, MetLife is the administrator and payor under the Plan.

Under EDS's Supplemental LTD Plan, an employee becomes eligible for long-term disability benefits if she has been disabled for 180 consecutive days and disability continues thereafter.  The Plan places the responsibility of providing satisfactory proof of disability and evidence of continuing disability on the claimant.  (*See* A.R. 230.)  The Plan defines "disability" as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.  during your Elimination period [180 days] and the next 24 month period, you are unable to earn more than 80% of your Predisability Earning or Indexed Predisability Earnings at your Own Occupation from any employer in your Local Economy; or
>
> 2.  after the 24 month period you are unable to earn more than 60% of your Indexed Predisability Earning from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(A.R. at 236.)

**B. Plaintiff's Employment with EDS**

2

Plaintiff began work at EDS in March of 1996.  Plaintiff has an Associates Degree in Applied Science, and worked at EDS as a Business Analyst.  (A.R. 48, 55.)  As a Business Analyst, Plaintiff was responsible for writing and developing computer applications.  (A.R. 96.)  Her job required her to sit 5-6 hours per day, stand 1-2 hours per day and walk 1-2 hours per day.  (A.R. 96.)  Plaintiff last worked for EDS on April 19, 2000.  (A.R.  48.)

### C.  Plaintiff's Initial Claim for Benefits

Plaintiff submitted her claim for benefits to Defendant on October 26, 2000 after she developed diabetic kytoacedosis following childbirth. (A.R. 48; Pl.'s Mot. Br. at 2.) As her brief description of her condition, Plaintiff stated: "Diabetic blood sugar levels are out of control after birth of daughter.  Experienced low reaction & paralysis on Right Side, currently seeing neurologist.  Cat scan is scheduled to determine stroke." (A.R. 51.)  She indicated that she expected to return to work on January 16, 2001, but that "getting [her] sugars back under control is essential to [her] returning to work.  Also getting good sleep is essential in good blood sugar control."  (A.R. 53.)

On November 3, 2000, Plaintiff's family practitioner, Karen Beasley, M.D., completed an Attending Physician Statement ("APS") and submitted it to MetLife.  (A.R. 57-58.)  Dr. Beasley began treating Plaintiff on October 26, 2000, the date of her emergency delivery.  (A.R. 57.)  Her primary diagnosis was "Type 1 DM" (type I diabetes mellitus), and her secondary diagnosis was "TIA."  (A.R. 57.)  According to Dr. Beasley, Plaintiff was exhibiting "varying BS [blood sugar] readings" and "subjective hypoglycemia."  (A.R. 57.)   Dr. Beasley indicated that Plaintiff should remain off work until she was seen by an endocrinologist to evaluate brittle diabetes mellitus.  (A.R. 57.)

3

Defendant approved Plaintiff's claim for LTD benefits on December 18, 2000, with a payment date of October 17, 2000. (A.R. 93-95.) Plaintiff's monthly benefit was calculated as $2,685.68 per month. (A.R. 94.) Defendant advised Plaintiff that it would periodically require updated medical certification for her claim, and that it would do so by contacting either Plaintiff or her physician by telephone or by mail. (A.R. 95.)

### D. Plaintiff's Subsequent Medical Records

On August 24, 2001, Dr. Beasley admitted Plaintiff to the hospital in order to stabilize her sugars. (A.R. 132.) Plaintiff's blood sugar level was 479. (A.R. 132.) Dr. Beasley noted that Plaintiff appeared washed out, tired and pale. Dr. Beasley also indicated that Plaintiff's attempts to manipulate her insulin pump on her own was "foolish," and that her "sugars have been out of control for months." (*Id.*) Dr. Beasley advised Plaintiff to follow-up with an endocrinologist as soon as possible. (*Id.*)[1]

Later that day, at the William Beaumont Hospital, Plaintiff was diagnosed with early diabetic ketoacidosis by Stephen Smith, M.D. (A.R. 137.) Dr. Smith indicated that she had a blood sugar level of 533. (A.R. 138.) Plaintiff was discharged the next day by Dr. Mark Zohoury after her "blood sugars were brought under control without difficulty." (A.R. 139.) Dr. Zohoury also diagnosed her with early diabetic ketoacidosis. (*Id.*)

On August 27, 2001, in response to Defendant's inquiry for updated information, Plaintiff submitted a Personal Profile to Defendant. (A.R. 104-109.) She indicated that

---

[1]Plaintiff had previously seen an endocrinologist, at least, on November 22, 2000, and possibly another time before her August 24, 2001 appointment with Dr. Beasley. (A.R. 134) Dr. Beasley's August 24, 2001 report indicates that Plaintiff had not seen an endocrinologist in "over 2 months." (A.R. 132.)

4

she was experiencing "weakness right side, memory & concentration problems.  Can't get blood sugars under control."  (A.R. 104.)  Plaintiff stated that she cared for her ten-year-old and 10-month-old child, and that she could perform limited housework but had trouble with her right-side.  (A.R. 106-107.)  She also indicated that she did "limited driving," and that she had gotten lost when driving a normal route.  (A.R. 107.)

On September 14, 2001, Neurologist Laura Churchill, M.D., submitted an APS to Defendant, with a primary diagnosis of post partum depression.  (A.R. 99.)  Plaintiff exhibited the following subjective and objective symptoms: weakness of right side, memory & concentration problems, severely depressed, memory "diff.," mild right sided weakness.  (*Id.*)  Dr. Churchill indicated that Plaintiff could sit/stand/walk intermittently for eight hours, but that she could not work for any hours.  (A.R. 100.)  Dr. Churchill further stated that Plaintiff could return to work, but the time-line given was "undetermined; will re-evaluate in six weeks."  (*Id.*)  According to Dr. Churchill, Plaintiff was unable to perform her job duties due to memory loss and concentration problems. (*Id.*)  Dr. Churchill prescribed Zoloft, an anti-depressant.  (A.R. 99)

Endocrinologist Dr. Abdul Al-Kassab examined Plaintiff on September 19, 2001, and commented that her medical history was "[n]egative for any diabetes related complications apart from DKA [diabetic ketoacidosis]" and that she also suffered from hypothyrodism.  (A.R. 5.)  Dr. Al-Kassab's recommendation was to "[a]djust the basals of the pump and obtain a very strict pre and post meal blood sugars and we will see her again in next four weeks to evaluate her progress."  (A.R. 117.)

5

Dr. Al-Kassab saw Plaintiff on November 7, 2001, he noted: "Fluctuating sugars; still mostly high; fearful of hypos." (A.R. 140.)  He again recommended that Plaintiff's insulin pump basals be adjusted.  (*Id.*)

On November 13, 2001, Dr. Churchill examined Plaintiff again.  (A.R. 157.) Plaintiff indicated that she had not noticed any significant improvement with the Zoloft, but that she had not had any devastating memory loss and her memory seemed to be improved somewhat.  (A.R. 157.)   Plaintiff also still complained of intermittent right sided weakness, especially if she experienced low blood sugar.  (*Id.*)  Dr. Churchill recommended that Plaintiff see a psychiatrist or a psychologist, but Plaintiff was "very reluctant to do so," stating that she would rather continue on the Zoloft a little longer to see if that worked.  (*Id.*)  Dr. Churchill told Plaintiff to return after getting an MRI to discuss the results.  (*Id.*)

Plaintiff returned to Dr. Churchill on March 14, 2002.  (A.R. 158.)  Plaintiff did not have any new neurological complaints, but indicated that she was not tolerating Zoloft and wanted to discontinue it.  (*Id.*)  Dr. Churchill advised her that she could do so, but that she needed to see a psychologist or psychiatrist to be treated for depression.  (*Id.*) Dr. Churchill recorded that Plaintiff had missed several MRI appointments, and that Dr. Churchill had "nothing further to offer" Plaintiff unless she got an MRI of her cervical spine to rule out any pathologic causes.  (*Id.*)  There is also a handwritten notation on Dr. Churchill's report that states: January 02; Broke Left Foot in 5 places as a result of Right Sided weakness.  (*Id.*)

On May 31, 2002, Defendant requested that by July 1, 2002, Plaintiff provide APS forms from her current treating physicians and copies of all medical records from

6

December 2001 to the present.  (A.R. 142.)  When Plaintiff did not respond, Defendant

sent a second request on July 9, 2002, giving Plaintiff until July 23, 2002 to respond to

the request.  (A.R. 149.)

Dr. Al-Kassab submitted an APS on July 25, 2002.  In his report, Dr. Al-Kassab

diagnosed Plaintiff with Type I DM [insulin dependent diabetes mellitus], with a

secondary diagnosis of hypothyroidism.  (A.R. 152.)  Dr. Al-Kassab indicated that

Plaintiff could sit/stand/walk 3-4 hours per day continuously.[2]  (A.R. 153.)  He further

noted that she could work a total of eight hours per day and that he had advised patient

to return to work when her sugars were under control.  (*Id.*)  Specifically, under the

"Prognosis" section of Al-Kassib's report it states:  "Have you advised patient to return

to work?"  The yes box beneath this statement is marked with an "x," however, the

report also states "If Yes, date of return," after which Dr. Al-Kassib wrote, "when well

controlled sugars."  (*Id.*)

## E.  Defendant's Denial and Plaintiff's Appeal

Based on Al-Kassab's statements contained in the July 25, 2002 report,

Defendant contacted Plaintiff by phone on August 9, 2002.  (A.R. 19.)  Phone records

show that Defendant explained that Al-Kassab's statement indicated that she could

return to work for eight hours a day as of July 25, 2002, and that it intended to end

Plaintiff's long-term disability benefits.  (*Id.*)  The phone records also provide evidence

that Plaintiff was upset and that she told Defendant's agent that her physician, Al-

Kassab, was out of the country and that she could not see him right away.  (*Id.*)

---

[2] Plaintiff's job at EDS required her to sit 5-6 hours per day, stand 1-2 hours per
day and walk 1-2 hours per day.  (A.R. 96.)

Defendant's agent explained that MetLife would send her a letter explaining its decision regarding the termination of her long-term benefits and her right to appeal the decision. (*Id.*)

Defendant officially notified Plaintiff of its decision to terminate her long-term disability benefits under the Plan by letter dated August 10, 2002.  (A.R. 160.)  In its August 10 letter, Defendant stated that Plaintiff no longer met the definition of total disability under the Plan based on her physician's statement that she was capable of returning to work full-time.  (*Id.*)  The letter stated that her benefits ended as of July 24, 2002, and that she had a right to appeal.  It also provided instructions on how to appeal and what to include in her appeal should she elect to file one.  Defendant's letter indicated that Plaintiff could file an appeal for up to 180 days from receipt of the August 10 denial letter.  (*Id.*)

Plaintiff responded to the denial letter by written response dated August 28, 2002, stating that she intended to appeal Defendant's decision to end her long-term disability benefits.  (A.R. 167.)  Plaintiff asserted that she believed her claim was improperly denied because her brittle diabetes was still not under control.  (*Id.*)  She listed several impairments and physical symptoms as evidence for why she felt she could not return to work.  (*See id.*)  Her letter also indicated that another doctor, "Dr. Sheldon" [Sheldon Siegel, MD] had suggested that she see a physician at the University of Michigan Internal Medicine Group in Ann Arbor, Michigan.  She also stated that she was "in the process of trying to get an appointment" with a physician in this group.  (*Id.*)

After receiving Plaintiff's August 28 letter, Defendant sent her a short letter on September 4, 2002, stating that it had received her appeal letter and that it had referred

8

her claim for an independent claim review.  (A.R. 173.)  It also stated: "If you have any additional information you wish to have considered, please submit it within 10 business days from the date of this letter." (*Id.*)  The September 4 letter did not state whether Plaintiff could obtain an extension to include additional documentation or how to request such an extension.

Plaintiff submitted a timely letter, dated August 13, 2002 from Dr. Sheldon N. Siegel, a psychiatrist, recommending that she be allowed to continue her leave from work for another eight weeks.  (A.R. 168.)  Plaintiff also submitted treatment records from Dr. Siegel.  (A.R. 174-189.)  Dr. Siegel noted a primary diagnosis of adjustment disorder and depression, with a secondary diagnosis of insulin dependent diabetes, and recommended continued sick leave for Plaintiff.  (A.R. 175-176.)  Dr. Siegel's notes indicate that Plaintiff's first visit with him was on August 2, 2002.   (A.R. 181.)

Defendant asked Dr. Gary Greenhood to conduct an independent review of Plaintiff's medical records as a physician consultant.  (A.R. 190-191.)  Dr. Greenhood concluded that Dr. Al-Kassab had released Plaintiff to work eight hours a day and that she could sit, stand, and walk for 3-4 hours without any restrictions.  (A.R. 192-194.) Dr. Greenhood's independent review also noted that Dr. Al-Kassab had recommended Plaintiff return to work "when well controlled sugars," but that there was no evidence or indication of hypoglycemia, hyporosmorality, or acidosis in Plaintiff after July 25, 2002. (A.R. 193.)  Dr. Greenhood concluded that Plaintiff's medical information on file did not support a severity of illness to preclude her from returning to work after July 25.  (*Id.*) Dr. Greenwood, however, stated that a mental health professional would need to

determine whether Plaintiff's psychiatric condition prevented her from returning to work. (*Id.*)

On September 19, 2003, Dr. Ernest Gosline, a board certified psychiatrist retained by Defendant, reviewed Plaintiff's claim, including the documentation and records submitted by Plaintiff from Dr. Siegel.  (A.R. 195.)[3]  According to Defendant, Dr. Gosline's review did not support a global impairment of functioning that would prevent Plaintiff from returning to her position with EDS.  (A.R. 195.)  He also indicated that the documentation submitted did not show a functional impairment or how Plaintiff's psychiatric condition impacted her ability to return to work based on her diabetic condition.  (A.R. 195-196.)  The report also stated that "prior to the disallowance of her disability . . . [Plaintiff] did not find it necessary to seek psychiatric treatment, and that the subsequent claim for a psychiatric condition appears to have been initiated after her internist released her to return to work based on her present diabetic condition."  (A.R. 196.)

After reviewing both independent physician reviews, Defendant notified Plaintiff that her appeal was denied on September 25, 2002.  (A.R. 197-198.)  Neither independent physician review included an additional examination of Plaintiff, but rather they included a review of the medical documentation submitted by Plaintiff's physicians. Based on the independent physicians' reports, Defendant concluded that "the medical evidence does not support a continuous disability beyond July 24, 2002 that would prevent [Plaintiff] from working, as defined in the plan."  (A.R. 198.)

_____

[3]Dr. Siegel's records are the only medical documentation referenced by Dr. Gosline, it is not clear whether Dr. Gosline considered any additional medical records in making his determination.

After Defendant had denied Plaintiff's appeal, Plaintiff was seen by Dr. Jennifer Franzese of the University of Michigan Health System's Diabetic Care Unit on September 30, 2002. Her new treating physician issued a letter on October 11, 2002, recommending that Plaintiff be placed on permanent disability based on her insulin dependent diabetes. (A.R. 201.) Dr. Franzese stated that Plaintiff was "unable to safely drive to get to the workplace and she [wa]s not safe from serious hypoglycemic episodes occurring while at work." (A.R. 201.) Dr. Franzese concluded that Plaintiff had "developed severe hypoglycemic unawareness, a complication of diabetes. She no longer has the ability to sense when her blood sugars are lowering or low." (A.R. 201.)

Dr. Franzese's records were initially not considered by Defendant in denying Plaintiff's disability benefits. After this litigation commenced, however, Plaintiff raised a procedural challenge relating to the failure of Defendant to review Dr. Franzese's records. After the court ordered that limited discovery be allowed relating to this claim, the parties agreed to dismiss this case without prejudice to allow Defendant to reconsider Plaintiff's claim for benefits, supplementing the record with the additional records from Dr. Franzese. (*See* 2/26/04 Order.)

Dr. Franzese's records were sent to Dr. Greenhood, who issued another report related to Plaintiff's claim. (A.R. 277-280.) The new report was substantially identical to the Dr. Greenhood's original report, except for the addition of Dr. Franzese's records, and the following discussion:

> The newly submitted information (which is now almost 2 years old) does not support an inability to work due to diabetes mellitus. There is no indication that the patient has had ketoacidosis, hypersmolar coma, retinopathy, neuropathy, nephropathy, coronary artery disease, peripheral vascular disease, or cerebrovascular disease. Dr. Franzese indicates that the patient is unaware of hypoglycemic episodes but there is no

11

substantiation that the patient has had hypoglycemic episdodes.  There is no indication of seizures or falls.  As of August of 2001, the patient indicated that she was driving an automobile.  Patients that have episodes of symptomatic hypoglycemia should be restricted from driving an automobile or operating other heavy machinery, being exposed to heights in an unprotected fashion, and climbing.

(A.R. 280.)  Dr. Greenhood's report was dated August 2, 2004, but Defendant did not notify Plaintiff that her appeal was again denied until March 10, 2005.  (A.R. 281.)  In a letter directed to Plaintiff's attorney, Defendant upheld the denial of Plaintiff's benefits claim, stating that "the records continue to lack objective evidence of Ms. Vick's inability to perform the duties of her own occupation as of July 25, 2002."  (A.R. 282)

Following this final appeal, the court granted Plaintiff's motion to reinstate this case and reopened the matter on April 8, 2005.[4]

## II.  STANDARD

In *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998), a panel of the Sixth Circuit set forth "Suggested Guidelines" to adjudicate claims based on improper denials of ERISA benefits.  The panel noted that a district court's review of a plan administer's determination should normally be confined to the evidence that was in the record before the plan administrator.  *Id.* at 618 (citing *Rowan v. Unum Life Ins. Co.*,

---

[4] Defendant did not issue its March 10, 2005 denial letter until after Plaintiff had moved to reinstate this case. The court's February 26, 2004 "Order Dismissing Case Without Prejudice" indicated that the case was being dismissed to allow Defendant to reconsider Plaintiff's claim for benefits, and that either party could move to reinstate by February 27, 2005.  (*See* 2/26/04 Order at 1-2.)  The order further stated that if neither party moved to reinstate the case by February 27, 2005, the dismissal would be with prejudice.  (*Id.* at 2.)  With the August 2, 2004, Greenhood report in hand, the fact that Defendant waited to notify Plaintiff of the denial of her appeal until after she moved to reinstate the case raises the unattractive possibility that Defendant was waiting for the February 27 deadline to pass, and with it the prejudice that would attach to the earlier dismissal. Another possibility, not much better, is bureaucratic sclerosis.

119 F.3d 433, 437 (6th Cir. 1997)); *Barone v. Unum Life Ins. Co. of Am.*, 186 F. Supp. 2d 777, 779 (E.D. Mich. 2002). The "Suggested Guidelines" in *Wilkins* direct the district court to review a plan administrator's decision based solely on the administrative record and render findings of fact and conclusions of law. *Wilkins*, 150 F.3d at 618; *Barone*,186 F. Supp. 2d at 779.

The district court reviews a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Marks*, 342 F.3d at 456. "If a plan affords such discretion to an administrator or fiduciary, we review the denial of benefits only to determine if it was 'arbitrary and capricious.'" *Marks*, 342 F.3d at 456 (citing *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991)). In this case, the court has already concluded that it will review the administrator's decision under the "arbitrary and capricious" standard. (*See* 2/5/04 Order at 9; 6/24/05 Order at 4.) The court rejects Plaintiff's invitation to revisit this issue.

A district court will uphold the determination of an administrator under the arbitrary and capricious standard if it is "rational in light of the plan's provisions." *Marks*, 342 F.3d at 457 (quoting *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998)). Where, as here, an entity both funds and administers the plan at issue, "there is an actual, readily apparent conflict." *Killian v. Healthsource Provident Admin., Inc.*, 152 F.3d 514, 521 (6th Cir. 1998). The Sixth Circuit has stated, that in such cases, the abuse of discretion or arbitrary and capricious standard still applies "but application of the standard should be shaped by the circumstances of [any] inherent

13

conflict of interest."  *Borda*, 138 F.3d at 1069; *see also Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000).

## III.  DISCUSSION

### A.  Plaintiff's Claim for Benefits

Having reviewed the parties' briefs and the administrative record, the court concludes that, despite the deferential review afforded to Defendant, Defendant's decision to deny Plaintiff's benefits was arbitrary and capricious.

There can be no substantive disagreement that Defendant's initial decision to discontinue Plaintiff's benefits was based primarily, if not exclusively, on Dr. Al-Kassab's July 25, 2002 APS.  Aside from the temporal proximity between the July 25 APS and Defendant's denial, Defendant's phone records indicate that Defendant called Plaintiff on August 9, 2002, and told her that it would be discontinuing her benefits because Dr. Al-Kassab's statement indicated that she could return to work for eight hours a day as of July 25, 2002.  (A.R. 19.)  This reason was also given in Defendant's official termination letter dated August 10, 2002, wherein Defendant stated that Plaintiff no longer met the definition of total disability under the Plan based on her physician's statement that she was capable of returning to work full-time.  (A.R. 160.)  Indeed, this interpretation of Dr. Al-Kassab's July 25, 2002 APS appears throughout Defendant's review process as the primary reason why Plaintiff's benefits were being discontinued.  (*See* Dr. Greenhood's 9/16/02 Report at A.R. 193; Dr. Gosline's 9/19/02 Report at A.R. 195-96; Dr. Greenhood's August 2, 2004 Report at A.R. 278; 9/25/02 Letter at A.R. 197-98; 3/10/05 Letter at 281.)  The court finds that Defendant's reliance on Dr. Al-Kassab's July 25,

14

2002 APS for the proposition that Plaintiff's physician had released her back to work was arbitrary and capricious.

While Dr. Al-Kassab indicated that Plaintiff could sit/stand/walk 3-4 hours per day continuously and that she could work a total of eight hours per day, he also specifically stated that Plaintiff could return to work "when well controlled sugars."  (A.R. 153) Defendant's immediate reaction upon receiving this APS was to cancel Plaintiff's benefits, despite the fact that Dr. Al-Kassab had not given any indication that her blood sugar was under control.  The court finds Defendant's interpretation of Dr. Al-Kassab's APS to be unreasonable and unsustainable based on the Administrative Record. Moreover, Defendant's interpretation, along with the speed with which Defendant denied Plaintiff's benefits after receiving the APS and the failure to, at a minimum, seek further clarification from Dr. Al-Kassab related to his statements, is evidence of bias in its administration of Plaintiff's benefits claim.

As the court noted in its February 5, 2004 Order, an actual conflict of interest exists in this case because Defendant is the administrator and the payor for the Plan. (2/5/04 Order at 10.)  The court therefore must consider this conflict of interest when reviewing the denial of benefits.  (*Id.*)   Furthermore, in *Firestone Tire & Rubber v. Bruch*, the Supreme Court noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" 489 U.S. at 109 (quoting Restatement (Second) of Trusts § 187, comment d (1959)).  The court finds that this bias, as evinced in the treatment of Dr. Al-Kassab's July 25, 2002 letter, weighs rather heavily in favor of finding an abuse of discretion.

15

Defendant's primary argument is that its decision to discontinue Plaintiff's benefits cannot be found to be arbitrary and capricious because it relied on the reasoned conclusions of two Independent Physician Consultants.  Defendant cites *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003), for the proposition that

> [g]enerally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

*McDonald*, 347 F.3d at 169 (citations omitted).  While it is true that a plan administrator's decision to rely on a reasoned medical opinion of one doctor over another is *generally* reasonable, even the *McDonald* court found that the plan administrator's decision to do so was unreasonable under the particular circumstances of the case where the chosen doctor's report was insufficient and should have been discounted.  *Id.*  As the *McDonald* court noted:

> "Review under [the arbitrary and capricious] standard is extremely deferential and has been described as the least demanding form of judicial review. It is not, however, without some teeth." *Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104, 1107-08 (7th Cir.1998) (internal citation omitted). " 'Deferential review is not no review,' and 'deference need not be abject.' " *Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir.2001)(quoting *Gallo v. Amoco Corp.,* 102 F.3d 918, 922 (7th Cir.1996)).

*Id.* at 169.

In this case, as in the *McDonald* case, Defendant's decision to rely on the reports of Dr. Greenhood and Dr. Gosline, rather than Plaintiff's treating physicians was

16

arbitrary and capricious.  First, the fact that Defendant relied on the reports of the

physicians it hand-selected and paid, rather than the Plaintiff's personal physicians, is a

factor which must be taken into consideration by the court because, under such

circumstances, "the potential for self-interested decision-making is evident."  *See*

*Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 292 (6th Cir. 2005) (citation omitted) ("As

the plan administrator, [the defendant] had a clear incentive to contract with individuals

who were inclined to find in its favor that [the plaintiff] was not entitled to continued LTD

benefits.").  Moreover, both Dr. Greenhood's and Dr. Gosline's reports contained

numerous errors and inherent inconsistencies, which should have been noted by the

plan administrator and resulted in less weight being given to them.

For example, Dr. Greenhood report[5] appears to be based on an incomplete

review of Plaintiff's medical records.  While the report indicates that Dr. Greenhood

reviewed the records of, among others, Dr. Al-Kassab and Dr. Churchill (A.R. 192; 277),

all of the relevant records are not noted in the "Synopsis of Reviewed Material," (A.R.

193-194; 278-288.)  The court does not expect a detailed explanation of every medical

record reviewed, but in this case, it is troubling that Dr. Greenhood provided detailed

accounts of the reviewed records from October 25, 2000 to September 19, 2001, but

then is silent with respect to any records between September 19, 2001 and July 25,

2002, especially inasmuch as this is the critical time period leading up to Defendant's

---

[5] Dr. Greenhood issued two reports: his initial report was issued on September 16, 2002, and then, pursuant to the parties' agreement, Dr. Greenhood reviewed Dr. Franzese's records and issued another report on August 2, 2004.  Because the two reports are virtually identical, with only the addition of Dr. Franzese's findings and a discussion of the newly submitted information, the court will refer primarily to the subsequent report.

17

denial.  Noticeably missing from Dr. Greenhood's report is any mention of Dr. Al-Kassab's November 7, 2001 office notes (A.R. 140), Dr. Churchill's November 13, 2001 office notes (A.R. 157), and Dr. Churchill's March 14, 2002 office notes (A.R. 158).  This is particularly significant in that Dr. Greenhood's August 2, 2004 report specifically noted that "[t]here is no indication of seizures or falls."  (A.R. 280.)  Dr. Churchill's March 14, 2002 report, however, indicates that as a result of her right sided weakness, Plaintiff broke her left foot in January 2002 – in five places, no less.  (A.R. 158.)  Dr. Greenhood's apparent failure to consider all of the available records, therefore, degrades the reliability of his report.[6]

Further, apparently in response to Dr. Franzese's opinion that Plainitff suffered from hypoglycemic unawareness, which makes driving an automobile dangerous, Dr. Greenhood opined that "[a]s of August 2001, the patient indicated that she was driving an automobile."  (A.R. 280.)  First, the fact that Plaintiff was driving an automobile in August of 2001 does not discount Dr. Franzese's October of 2002 diagnosis of hypoglycemic unawareness and his recommendation that she was unable to safely drive to the workplace.  (A.R. 201.)  Second, even if Plaintiff's August of 2001 driving ability was relevant, Dr. Greenhood failed to note that Plaintiff indicated that she only performed "limited driving" and that she had gotten lost when driving a normal route.

_____

[6] The court cannot definitively find that Dr. Greenhood was not given all of the necessary records, although the record certainly suggests that conclusion.  If such were the case, Defendant 's action in "cherry-picking" and selecting the medical records to send to Dr. Greenhood was arbitrary and capricious.  *See Spangler v. Lockheed Martin Energy Sys., Inc.,* 313 F.3d 356, 362 (6th Cir. 2002).  The court can say only that it *appears* that Dr. Greenhood did not have all of the necessary files and that his failure to document and consider those files rendered his report unreliable.

18

(A.R. 107.)  Further, Dr. Greenhood did not note Dr. Churchill's September 14, 2001 opinion that Plaintiff was not mentally able to operate a motor vehicle.  (A.R. 102.)

The court also finds that Dr. Greenhood's August 2, 2004 report placed excessive weight on the age of Dr. Franzese's medical records.  While it is not clear precisely how much import Dr. Greenhood placed on the age of the records, Dr. Greenhood certainly believed it significant enough to note their age in what reads as a negative connotation.  (A.R. 280.)  Specifically, Dr. Greenhood noted that the newly submitted information (consisting of Dr. Franzese's records) "is now almost 2 years old." (A.R. 280.)  In the court's opinion, the age of the records was entitled to *no* weight or significance in Dr. Greenhood's secondary review of Plaintiff's file, inasmuch as they were submitted to Dr. Greenhood as a settlement to Plaintiff's procedural challenge to Defendant's failure to consider them in the first review.  Although Dr. Greenhood did not directly indicate that the age of the records negatively impacted his review of them, his decision to include such a notation raises a question of his impartiality to Plaintiff's case.

Dr. Gosline's report is even less reliable than Dr. Greenhood's report.  Under "Documents Reviewed," Dr. Gosline's report indicated that Dr. Siegel, Plaintiff's psychiatrist, had "only recently become involved in this case and the first date we have is 09/04/02."  (A.R. 195.)  In the "File History," however, Dr. Gosline acknowledges the presence of Dr. Seigel's office notes from August 1, 2002[7] and August 23, 2002.  (A.R. 195)  Dr. Gosline's proceeds to find that "prior to the disallowance of [Plaintiff's] disability . . . she did not find it necessary to seek psychiatric treatment."  (A.R. 196.)

---

[7]According to the Administrative Record, this date should have been August 2, 2002.  (A.R. 181)

The Administrative Record reveals a flaw in this conclusion: according to the Record, Plaintiff first saw Dr. Seigel on August 2, 2002, (A.R. 181), and she was not told that her benefits were being discontinued until August 9, 2002.  (A.R. 19)  Moreover, her disability benefits were not officially discontinued until August 10, 2002.  (A.R. 160.) Thus, Dr. Gosline's conclusion that she did not seek psychiatric treatment until after her benefits were discontinued is simply untrue.  Similarly, Dr. Gosline's statement that Plaintiff's "subsequent claim for a psychiatric condition appears to have been initiated after her internist released her to return to work" (A.R. 196) is based on *two* false premises.  First, there is nothing in the record to indicate that Plaintiff had any knowledge of the contents of Dr. Al-Kassab's July 25, 2002 APS before she heard about it from Defendant.  Second, even if she had, as discussed above, Dr. Al-Kassab's statement can be reasonably read only as a *conditional* release to work.

Finally, it is unclear from Dr. Gosline's report whether she considered any medical records aside from the reports of Dr. Siegel.  While Dr. Gosline states that she has reviewed "[a]ll information from the A.C.S.," the only specific doctors whom she lists are Dr. Siegel and Dr. Greenhood.  It seems to the court that additional available records should have been reviewed and considered by Dr. Gosline before issuing her report.  At a minimum, for example, Dr. Churchill's records which diagnosed Plaintiff with post-partum depression and prescribed Zoloft are significant enough to at least deserve mention by Dr. Gosline.  (A.R. 99; 157; 158.)

Accordingly, Defendant's decision to rely on Dr. Gosline and Dr. Greenhood's reports, rather than the opinions of Plaintiff's treating physicians, who unanimously and consistently found her to be disabled, was arbitrary and capricious.  In so holding, the

20

court specifically does not find that Plaintiff's treating physicians were entitled to more credence than Defendant's independent medical examiners, as the Supreme Court has rejected the "treating physician rule" in ERISA cases.  *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003).  Nonetheless, even the *Nord* Court held that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Id.*  Here the court finds that this is exactly what Defendant did by arbitrarily refusing to accept the opinions of Plaintiff's physicians.  While it is true that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," *id.* Here, Defendant did not credit *reliable* evidence when choosing to accept Dr. Greenhood and Dr. Gosline's opinions over those of Dr. Siegel, Dr. Churchill, Dr. Franzese and Dr. Al-Kassab.

This conclusion is further bolstered by the fact that, although the Plan specifically reserved the right to conduct a medical examination of Plaintiff (A.R. 260), Defendant did not choose to do so in this case, even where the independent medical examiners' opinions so drastically differed from all of Plaintiff's treating physicians.  As the Sixth Circuit has stated:

> Thus, while we find that [the defendant's] reliance on a file review does not, standing alone, require the conclusion that [the defendant] acted improperly, we find that the failure to conduct a physical examination-- especially where the right to do so is specifically reserved in the plan-- may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

21

*Calvert v. Firstar Finance, Inc.* 409 F.3d 286, 295 (6th Cir. 2005).

Defendant argues that Plaintiff has not met her burden of demonstrating objective evidence of continuing disability, and thus it was not unreasonable to discontinue her benefits. Additionally, Defendant's denial letter quotes Dr. Greenhood's report that Plaintiff's records do not support her inability to work based on diabetes mellitus. (A.R. 282.) Specifically, Defendant asserts that there is "no indication that she had ketoacidosis, hypersmolar coma, retinopathy, neuropathy, nephropathy, coronary artery disease, peripheral vascular disease, or cerebrovascular unawareness." (A.R. 282.) The court is not persuaded that this laundry list of conditions which Plaintiff does not have makes Defendant's denial reasonable. It is not enough to simply list various infirmities from which a claimant does not suffer; Defendant must base its denial on its review of the conditions from which Plaintiff does suffer. In other words, it may be true that Plaintiff does not suffer from coronary artery disease, (as well as a plethora of other diseases), but Defendant must nonetheless analyze her limitations based on the condition from which she does suffer.

To that end, the court agrees that it is Plaintiff's burden, under the terms of the Plan, to demonstrate her continuing disability (A.R. 236), but finds that the Administrative Record amply supports her on-going disability due to her fluctuating sugar levels, the control of which was exacerbated by her mental condition. Defendant dismisses Plaintiff's fluctuating blood sugar levels, arguing that they fail to "show a functional impairment which prevented Plaintiff from performing her sedentary job. Plaintiff cannot rely upon her subjective complaints." (Def.'s Reply at 5.) Plaintiff's documented sugar levels, however, are not "subjective complaints," but instead are

22

objective evidence that her blood sugars were not under control.[8]  (See, e.g., A.R. 132,

137-139, 140, 200-208.)  Similarly, Plaintiff's symptom of right-sided weakness, cannot

be said to be untestably subjective, inasmuch as it resulted in a broken foot in January

of 2002.  (See, e.g., A.R. 99-100, 158.)[9]

    Further, contrary to Defendant's argument, Plaintiff's physicians explained how

Plaintiff's condition functionally limited her capacity to work.  Specifically, Dr. Franzese

stated that Plaintiff's hypoglycemic unawareness prevented her from sensing when her

blood sugars were lowering, which in turn meant that Plaintiff was "unable to safely

drive to get to the workplace and she [wa]s not safe from serious hypoglycemic

episodes occurring while at work."  (A.R. 201.)  Likewise, on September 4, 2002, Dr.

Siegel indicated that Plaintiff was unable to engage in stressful situations or engage in

interpersonal relations because any kind of stress produces an increase in her blood

sugar level and that her blood sugar was "very labile."  (A.R. 176.)

    The court finds that Defendant's decision to rely on the reports of Dr. Greenhood

and Dr. Gosline, rather than the opinions of all of Plaintiff's treating physicians was

arbitrary and capricious.  As in Calvert, when the court compares Dr. Greenhood and

_____

    [8]For this reason, the court reject's Defendant's argument that, although Dr. Al-
Kassab's report indicated that she could return to work 8 hours a day when "well
controlled sugars," his APS form of July 2002 did not contain "medical evidence
showing that Plaintiff's blood sugars were not controlled at that time."  (Def.'s Reply at
6.)

    [9]Defendant's reliance on Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376,
382 (6th Cir. 1996), is therefore misplaced.  In Yeager, the Sixth Circuit upheld the
administrator's denial of benefits where there was "no definite diagnosis of [the]
plaintiff's condition" and the plaintiff's physicians relied only on her subjective complaints
of joint pain and fatigue.  Id.  As discussed above, in this case, Plaintiff's physician's
diagnosed her based not only on her subjective explanations, but also on her objective
signs.

Dr. Gosline's insufficient file reviews to the thorough objectively verifiable determinations of Plaintiff's treating physicians, and when the court also considers Defendant's conflict of interest, the court concludes that Defendant's decision to deny continuing disability benefits to Plaintiff was arbitrary and capricious.  *See Calvert*, 409 F.3d at 297.  In so holding, the court is cognizant that the arbitrary and capricious standard is "extremely deferential and has been described as the least demanding form of judicial review.  *McDonald,* 347 F.3d at 172 (quoting *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)).  Nonetheless, it is not without "some teeth," *id.*, and this court has

> an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence-- no matter how obscure or untrustworthy--to support a denial of a claim for ERISA benefits.

*Id.* (citing *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 774-75 (7th Cir.2003)).  Here, the court may not simply "rubber stamp" Defendant's decision when the evidence on which it relies is inherently unreliable and untrustworthy as compared to the evidence which supports Plaintiff's claim for continued disability benefits.

### B.  Defendant's Counter-Claim for Overpayment of Social Security Benefits

Independent of Defendant's determination regarding eligibility for long-term disability benefits, Plaintiff was required to file a claim for Social Security Disability

24

benefits.  Plaintiff submitted her application for such benefits in September of 2002 and gained approval for Social Security Disability benefits on February 17, 2003.  (A.R. 209.)  In her award of benefits letter, the Social Security Administration determined that Plaintiff had been completely disabled since October 24, 2000.  (A.R. 209.)

Based on this Social Security award, Defendant seeks reimbursement of benefits it paid to Plaintiff which should have been reduced by the amount of Social Security Plaintiff could have received upon making timely application.  Defendant relies on the LTD Plan, which provides that Defendant has a right to recover from a participant any amount that Defendant determines to be an overpayment.  (A.R. 241-243; 259.)  In accordance with this provision, Plaintiff signed and dated an "Agreement to Reimburse Overpayment of Long Term Disability Benefits" on October 26, 2000.  (Sullivan Aff. at Ex. 1.)

Defendant has presented evidence that Plaintiff received benefits under the LTD Plan from October 17, 2000 through July 24, 2002 in the amount of $2,685.68 per month.  (Sullivan Aff. at ¶ 8.)  On February 17, 2003, Plaintiff was awarded Social Security Disability Benefits in the amount of $1,305.60 per month, retroactive to September, 2001.  (*Id.* at ¶ 9.)  The Social Security Award letter indicates that Plaintiff became disabled under the Social Security Administration rules on October 24, 2000. (Sullivan Aff. at ¶ 10, Ex. 2.)

Defendant argues that had Plaintiff timely applied for Social Security benefits, she would have begun receiving benefits in April 2001, and her payments should have been reduced from April 2001 through July 24, 2002.  In Defendant's original motion, it asserts that Plaintiff received an overpayment during this period of $1,305.60 per

25

month, resulting in a total overpayment of $21,135.59.  (Def.'s Mot. Br. 11; Sullivan Aff.

at ¶¶ 11- 13.)  In an amended affidavit attached to Defendant's reply, however, Ms.

Sullivan contends that Plaintiff received an overpayment for this time period of $1957.00

per month (including $652.00 per month in Social Security Family/Dependent benefits),

resulting somehow in the same total amount of overpayment of $21,135.59 (1/27/06

Sullivan Aff. ¶¶ 11-13.)  The court is more than a little perplexed at how the monthly

overpayment could increase but the total overpayment remain the same.  Nonetheless,

inasmuch as Plaintiff has not offered any evidence to refute the total amount and

because Defendant did not attempt to *increase* the total amount of overpayment, the

court will accept $21,135.59 as the undisputed amount of overpayment.  Further, in her

Amended Affidavit, Ms. Sullivan also avers that the $21,135.59 overpayment should be

reduced by an approved lawyers fee of $5300.00, resulting in a final overpayment

amount of $15,835.59.  (*Id.* at ¶ 12.)

Plaintiff has not presented any evidence to refute Defendant's evidence of

Plaintiff's obligation to repay this amount, and instead argues that Defendant should be

estopped from collecting this amount under the language of *Darland v. Fortix Benefits*

*Insurance Company*, 317 F.3d 516 (6th Cir. 2003).  In *Darland*, the Sixth Circuit held

that it was inconsistent for the defendant insurance company to ignore the Social

Security Administration's determination that Plaintiff was disabled, while simultaneously

seeking reimbursement for overpayment of benefits resulting from the Social Security

Award.  *Id.* at 530 ("Though not directly applicable in this case, the principles of judicial

estoppel certainly weigh against [the defendant] taking such inconsistent positions.")

26

The *Darland* court, however, did not hold that the defendant could not seek the reimbursement of overpayments, but that the defendant should not be able to ignore the Social Security determination. *Id.* at 530-532. Plaintiff here seeks to reverse the logic of *Darland* to argue that, because Defendant did not take the Social Security determination into account when denying her benefits, Defendant cannot seek reimbursement of the overpayment to which it is contractually entitled. Plaintiff has not pointed to any authority that sustains such a strained interpretation of *Darland*, and the court declines to accept it.

Moreover, *Darland* was based on the Sixth Circuit's view that the "treating physician rule . . ., requiring courts to defer to the opinions of a claimant's treating physicians unless there is substantial evidence contradicting them," should apply in ERISA cases, as well as in Social Security cases. *Id.* at 532. This view was rejected by the Supreme Court in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003), which held that the treating physician rule does not apply in ERISA cases. *Id.* As the Sixth Circuit has recognized, *Darland*'s reasoning, which predated *Nord*, is no longer authoritative. *See Whitaker v. Hartford Life & Accident Insur. Co.*, 404 F.3d 947, 949 (6th Cir. 2005).

Inasmuch as Plaintiff has failed to present any evidence or further argument to refute Defendant's showing that it is entitled to summary judgment on its counterclaim,[10]

_____

[10]Plaintiff does argue that "if Defendant is entitled to any credit for [Social Security] benefits, at most they are entitled to the amount Plaintiff actually received for the period that Defendant was paying her LTD benefits minus the amount paid to Defendant's appointed attorney for obtaining those benefits." (Pl.'s Resp. at 2.) Plaintiff, however, fails to present any evidence which negates the clear language of the Plan, which requires Plaintiff to repay, not only for the period which she actually

the court will grant Defendant's motion and award judgment in favor of Defendant on

this claim in the amount of $15,835.59.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986) (holding that moving party is entitled to summary judgment where it has

met its initial burden and the non-moving party fails to establish the existence of a

disputed factual element).

### C.  Defendant's Motion to Strike

Defendant has also filed a "Motion to Strike Material in Plaintiff's Motion for

Judgment that is Outside of the Administrative Record," asking the court to strike

various documents which Plaintiff attached to her motion to strike.  These documents

consist of background medical information printed from the internet relating generally to

Plaintiff's medical conditions.  While it is true that these documents are outside of the

administrative record, they were clearly presented as background information and, in

any event, were not central to the court's analysis.  Accordingly, Defendant's motion will

be denied.[11]

### IV.  CONCLUSION

IT IS ORDERED that Defendant's "Motion to Strike Material in Plaintiff's Motion

for Judgment that is Outside of the Administrative Record" [Dkt. # 27] is DENIED and

---

received the benefits, but also for the period that she "would have been eligible to
receive upon making timely application."  (A.R. 242.)

[11]The court also rejects Plaintiff's argument that if the court were to strike
Plaintiff's exhibits, it should also strike the Sullivan affidavit as outside the administrative
record.  (Pl.'s Resp. to Mot. to Strike at 1.)  The Sullivan affidavit was presented in
support of Defendant's motion for judgment on its counterclaim, which need not be
confined to the administrative record under the principles of *Wilkins v. Baptist
Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998).

Defendant's "Motion to Affirm the Administrator's Decision  . . ." [Dkt. # 29]  is DENIED

IN PART and GRANTED IN PART.  It is GRANTED with respect to Defendant's request

for reimbursement of an overpayment in the amount of $15,835.59.  It is DENIED in all

other respects.

IT IS FURTHER ORDERED that Plaintiff's "Motion for Judgment" [Dkt. # 26] is

GRANTED[12] and the decision of the administrator denying Plaintiff continued benefits is

REVERSED.

Finally, IT IS ORDERED that the parties shall present to the court a stipulated

Judgment, agreed upon as to form, on or before **February 27, 2006.**


 s/Robert H. Cleland                                    
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  February 21, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 21, 2006, by electronic and/or ordinary mail.


 s/Marcia Beauchemin                                    
Deputy Clerk
(313) 234-5522

---

[12]The court, however, denies without prejudice Plaintiff's one-sentence request
for attorney's fees, contained in the last paragraphs of Plaintiff's motion and response
briefs, inasmuch as it is unsupported by separate motion and brief.